THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DUANE MEDDOWS, Defendant-Appellant.

Fifth District    No. 80-187

Opinion filed September 22, 1981.

John H. Reid and Brian D. Lewis, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

John Baricevic, State's Attorney, of Belleville (Gillum Ferguson and Raymond F. Buckley, Jr., both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE JONES delivered the opinion of the court:

A jury found the defendant, Duane Meddows, guilty of the murder of his father, Cletus Meddows, who died as a result of serious injuries sustained when dynamite exploded beneath him. The victim died on August 27, 1975. After having been found, first, fit and, later, unfit to stand trial, defendant was on February 1, 1977, once again found fit to stand trial. Thereafter the State brought an interlocutory appeal (*People v. Meddows* (1978), 67 Ill. App. 3d 995, 385 N.E.2d 765, *cert. denied* (1979), 444 U.S. 950, 62 L. Ed. 2d 320, 100 S. Ct. 422), from an order of the trial court suppressing certain statements of the defendant and physical evidence seized from the trunk of his car. In that appeal we found that the suppressed evidence had not been "come at by exploitation" of an interrogation that occurred without benefit of *Miranda* warnings, and we reversed the suppression order of the trial court accordingly. In this

appeal defendant raises two issues: (1) whether his consent for the search of his automobile and bedroom was voluntary, and (2) whether comments of the State's Attorney during closing argument, in which he referred, according to defendant, to the accused's failure to take the witness stand, served to deny defendant the opportunity for a fair trial.

We consider first the search of defendant's bedroom. At the time of the explosion the victim and defendant were hunting along a dry creek bed. Investigating the incident, police found at the site evidence of a booby trap, including a 40-foot length of wire, a battery and 14 sticks of undetonated dynamite. As a deputy sheriff and a Federal agent were questioning defendant at the sheriff's department two days after the incident occurred, they received a telephone call from another officer saying that one of defendant's relatives, Clarence Buddy, had reported the presence of dynamite in the house trailer where the victim had lived with his wife, Carolyn Meddows, and defendant, her stepson. Also reported to be in the trailer were small children who had come with their family to attend the victim's funeral. The officer calling with this information believed that the "Mr. Meddows" to whom Clarence Buddy referred as having dynamite in the trailer was the victim rather than his son. By the time this officer called the ones who were questioning defendant at the sheriff's department, he had gone to the funeral home where Carolyn Meddows was and had obtained from her, after "a bit of a fainting spell," oral consent to search the trailer. At the time she told the officer that she had seen dynamite in the defendant's room, to which she had access.

At the hearing to suppress illegally seized evidence defendant did not testify, but one of the two officers who had been questioning him testified that upon receiving this information they believed they needed defendant's consent to search his bedroom in the trailer. This officer said that prior to receiving defendant's consent the two officers informed him that they had obtained Carolyn Meddows' consent to search the trailer and that officers were on their way to the trailer but that they could not search defendant's room without his consent. The officer testified that defendant, asked by the two officers what they would find at the trailer, responded that they would find dynamite, which defendant thereupon admitted having stolen from the coal mine where he worked as a "dynamite shooter." Arrested for theft of the dynamite and advised of his rights, defendant then gave his written consent to search both his bedroom and his automobile. Thereafter, he indicated that at the trailer were relatives from out of town, including children, one of whom—four or five years of age—had, he said, helped clean defendant's room from time to time. In response to questioning, defendant said that in the room, in addition to the dynamite, were blasting caps. At that juncture one of the

two officers questioning him got on the dispatcher's radio to advise those officers on their way to conduct the search of the trailer "to be careful, that there was definitely dynamite in his room and we asked them to wait until we got there." According to the officer, when they arrived at the trailer they found "four or five" people in it, "a husband and wife and three children or two children, I'm not sure how many."

At the suppression hearing the officer who had learned from Clarence Buddy of the presence of the dynamite in the trailer testified, "After he [Buddy] had given us this information, our main concern was an emergency type situation, if there was dynamite in that trailer." The officer later reiterated this concern, at one time stating, "I know our main concern was to get to that trailer because of these children," and at another testifying as follows:

> "Q [State's Attorney]: * * * [W]hen you went to the funeral home to get consent, you wanted to get into the trailer for the prime motive of the safety of the people there, is that correct?
>
> A: To get * * * the dynamite out of that trailer with these kids being in the trailer, that was our number one concern.
>
> Q: And in that regard, when you went there, you were going there assuming that that was Cletus Meddows', the victim's, dynamite and had no relationship to the defendant.
>
> A: Yes, sir.
>
> Q: So you weren't motivated by gathering evidence as much as the safety of the people inside?
>
> A: That was the main thing at the time was the safety of anybody around that trailer."

The search of defendant's room revealed 90 blasting caps, a roll of detonating cord and 96 sticks of dynamite. In the hallway of the trailer police found shot firing wire, numerous rolls of tape, including electrical and friction tape, and several batteries.

Although defendant contends that the search of his bedroom was illegal because not obtained as a consequence of his voluntary consent, the State maintains that the warrantless search was legal for several reasons, including the existence of exigent circumstances, namely, the presence of dynamite in a residence where young children were visiting.

■■ In Illinois the emergency exception to the warrant requirement is recognized. (*People v. Lewis* (1979), 75 Ill. App. 3d 259, 393 N.E.2d 1098. See also Bacigal, *The Emergency Exception to the Fourth Amendment*, 9 U. Rich. L. Rev. 249 (1975); Mascolo, *The Emergency Doctrine Exception to the Warrant Requirement under the Fourth Amendment*, 22 Buff. L. Rev. 419 (1973); Note, *The Emergency Doctrine, Civil Search and Seizure, and the Fourth Amendment*, 43 Fordham L. Rev. 571 (1975); ALI Model Code of Pre-Arraignment Procedure §§260.5 (1975).) It is well

established that, under this exception, police may make a warrantless entry into private premises if they reasonably believe an emergency exists. (*People v. Householder* (1980), 81 Ill. App. 3d 31, 400 N.E.2d 988; *Lewis*; *People v. Kepi* (1978), 65 Ill. App. 3d 327, 382 N.E.2d 642.) The purpose—to offer assistance to a citizen possibly imperiled, not to obtain evidence of a crime—justifies such a search. (*People v. Elders* (1978), 63 Ill. App. 3d 554, 380 N.E.2d 10; *People v. Swansey* (1978), 62 Ill. App. 3d 1015, 379 N.E.2d 1279; *People v. Lovitz* (1976), 39 Ill. App. 3d 624, 350 N.E.2d 276, *cert. denied* (1977), 434 U.S. 842, 54 L. Ed. 2d 107, 98 S. Ct. 141.) As was pointed out in *Lovitz*, "Generally speaking, the entry and search of a private dwelling without a warrant is constitutionally prohibited except under circumstances where the police are confronted with an emergency which dictates the need for immediate action" (39 Ill. App. 3d 624, 629, 350 N.E.2d 276, 279), the need for immediate action precluding an opportunity to obtain a search warrant. The reasonableness of the belief that an emergency, a situation requiring immediate action, existed is determined by the entirety of all of the circumstances known to the police at the time of the entry. (*People v. Clayton* (1975), 34 Ill. App. 3d 376, 339 N.E.2d 783; *People v. Brooks* (1972), 7 Ill. App. 3d 767, 289 N.E.2d 207.) In *Mincey v. Arizona* (1978), 437 U.S. 385, 57 L. Ed. 2d 290, 98 S. Ct. 2408, the court stated,

> "We do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. * * * 'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.' *Wayne v. United States*, 115 U.S. App. D. C. 234, 241, 318 F.2d 205, 212 (opinion of Burger, J.). And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities." (437 U.S. 385, 392-93, 57 L. Ed. 2d 290, 300, 98 S. Ct. 2408, 2413.)

Quoting *Terry v. Ohio* (1968), 392 U.S. 1, 26, 20 L. Ed. 2d 889, 908, 88 S. Ct. 1868, 1882, the court in *Mincey* continued with the caution that "a warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation.'" 437 U.S. 385, 393, 57 L. Ed. 2d 290, 300, 98 S. Ct. 2408, 2413.

■■ In the case at bar the officer who had first learned of the presence of dynamite in the trailer testified unequivocally that the purpose of searching the trailer was to protect the young children in it from possible harm. At the time he learned about the dynamite in the trailer, the officer was under the impression that the dynamite had belonged to the victim

and did not associate the defendant with it. The purpose of the warrantless search, then, was not to obtain evidence of a crime in circumvention of the fourth amendment but to prevent possible disaster. The police had been told by three persons, Clarence Buddy, Carolyn Meddows and defendant himself, that dynamite was in the trailer where the victim, who died as a consequence of an explosion of dynamite, had lived and where defendant, who had just admitted stealing dynamite from the coal mine where he worked as a "dynamite shooter," still lived. Police had also been told that young children, one of whom had helped to clean defendant's room in the past, were staying at the trailer. The child who had previously helped defendant in his room could well have believed that he could go into defendant's things on this occasion as well. Under the entirety of the circumstances known to police at the time of entry, the belief that an emergency existed was eminently reasonable. In our view the ensuing search for the dynamite, which revealed a vast array of explosive paraphernalia, was, as is required, strictly circumscribed by the extraordinary exigencies justifying its initiation. We therefore hold the search of defendant's bedroom legal and the evidence seized as a result of it properly not suppressed. Because the search fell within the emergency exception to the warrant requirement, we need not consider whether defendant's consent to search his bedroom in the trailer was voluntary.

We turn now to the search of defendant's automobile. As has already been said, after the officers who had been questioning defendant received the telephone call with respect to Clarence Buddy's information, they notified defendant that the trailer was to be searched pursuant to Carolyn Meddows' consent. They advised him, however, that they could not search his room without his consent. Thereafter defendant consented in writing to the search of his bedroom and his automobile. Although the search of the trailer took place as soon as possible after police were notified of the presence of dynamite in the trailer where small children were, the search of the automobile did not take place until four days later. During that four-day period defendant's late model automobile was at an automobile repair shop for work pertaining to the warranty, and those at the shop had access to all parts of the vehicle. The automobile was then towed to the basement of the jail, where, in defendant's presence, several officers searched it, including the trunk. The officers testified at the suppression hearing that they wanted defendant to be present during their search of the automobile in case the vehicle contained a booby trap. The search of the trunk revealed part of a cardboard box used for shipment of motor oil. A lettered piece of cardboard that was used in the booby trap, and found at the site of the explosion, proved to be the segment torn from the cardboard box found in the trunk of defendant's automobile.

In view of the fact that the defendant's automobile was not searched

for four days after police acquired the information about the dynamite in the trailer and the further fact that during this time workers at the automobile repair shop apparently could have had access to any part of the vehicle, there were no exigent circumstances with respect to the warrantless search of the automobile, nor does the State in its brief suggest that there were.

For defendant's contention that his consent to the search of his automobile was not voluntary he relies heavily upon *Bumper v. North Carolina* (1968), 391 U.S. 543, 20 L. Ed. 2d 797, 88 S. Ct. 1788, in which the court held that there can be no consent when it is given only after the official conducting the search has asserted that he possesses a warrant. There the court said,

> "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." (391 U.S. 543, 548-49, 20 L. Ed. 2d 797, 802, 88 S. Ct. 1788, 1792.)

In the instant case the defendant maintains that he merely acquiesced to a claim of lawful authority as indicated by the testimony of the officers at the suppression hearing. That testimony, defendant states in his brief, "clearly indicated that defendant gave his consent to search only after they had told defendant that agents were going to search the trailer with or without his consent." Defendant omits any reference to the unequivocal and unrebutted testimony that the officers advised defendant that though they had obtained Carolyn Meddows' consent to search the trailer, they could not search defendant's bedroom in it without his consent. Rather than representing that they had lawful authority to search defendant's bedroom without his consent, these officers represented that they did not have such authority and were, for that reason, seeking his consent. This consent was, of course, for the search of defendant's bedroom. However, nothing in the record suggests that the officers at any time indicated to defendant that they had lawful authority to search his automobile without his consent.

■■ Whether a consent has been voluntarily given and is not the result of duress or coercion, either express or implied, is a question of fact to be determined from all the circumstances. (*Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041.) In his brief, citing *People v. Shaver* (1979), 77 Ill. App. 3d 709, 396 N.E.2d 643, defendant states that one of the circumstances to be considered is "the very atmosphere, or setting, where the alleged consent was obtained." In *Shaver* the defendant was handcuffed and transported in a locked police van to the police station. The court held that these circumstances together

with the surroundings at the station created a coercive atmosphere invalidating the defendant's consent. Defendant in the case at bar likens his situation to that of the defendant in *Shaver*, saying,

> "Similarly, the defendant in the instant case was transported to the station in a police car, was then interrogated for hours, and finally was confronted with the fact that the search to which he was being asked to consent was going to take place regardless of his own actions. Under these circumstances, defendant acquiesced to a search of his bedroom and his automobile. Clearly the atmosphere was not conducive to a free and voluntary consent."

As we have just said, contrary to defendant's assertions, defendant was not told that the search of either his bedroom or his automobile would occur with or without his consent. Furthermore, defendant neglects to mention that, according to the testimony, he was transported from the funeral home to the sheriff's department in a police car because his own automobile was at the time in the repair shop and unavailable to him. Unlike the defendant in *Shaver*, this defendant was at no time handcuffed or in a locked vehicle. In fact, the officers testified that defendant was free to leave at any time during the afternoon of questioning until they arrested him apparently a few moments before he consented in writing to the search of his bedroom and automobile. In the middle of the afternoon, prior to his arrest, he was advised of his rights.

■■ In *United States v. Watson* (1976), 423 U.S. 411, 424, 46 L. Ed. 2d 598, 609, 96 S. Ct. 820, 828, where the defendant had been arrested and was in custody when he gave his consent on a public street, though not in the confines of a police station, the court remarked,

> "[T]he fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search. Similarly, under *Schneckloth*, the absence of proof that Watson knew he could withhold his consent, though it may be a factor in the overall judgment, is not to be given controlling significance."

Our examination of all the circumstances in the case at bar discloses that the defendant's consent was not the result of duress or coercion, either express or implied, but was freely and voluntarily given. We therefore hold the search of defendant's automobile legal and the evidence seized during that search properly not suppressed.

■■ With reference to the issue defendant raises as to the State's Attorney's comments during closing argument, the State argues—and this argument is borne out by the record—that the defendant failed to object to the remarks at the time they were made and likewise failed to include the point in his extensive written post-trial motion. The general rule is that the failure by a defendant to raise an issue in the written motion for a new trial constitutes a waiver of the issue so that it cannot be urged as a ground

for reversal on review. (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.) Furthermore, even if the prosecutor's comments were, in fact, objectionable, the overwhelming evidence of defendant's guilt in this case would have rendered any such error harmless.

Affirmed.

KASSERMAN, P. J., and KARNS, J., concur.