THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v.
DENNIS KONIECKI *et al.*, Defendants-Appellees.

Second District   Nos. 84—103, 84—151 cons.

Opinion filed July 24, 1985.

Fred L. Foreman, State's Attorney, of Waukegan (Phyllis J. Perko and Marshall Stevens, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Herbert Abrams, of Stephen, Wade, Zucker, Ltd., of Skokie, for appellees.

JUSTICE REINHARD delivered the opinion of the court:

Defendants, Dennis Koniecki and Jaclyn Holk, were both separately charged with unlawful possession with intent to deliver more than 500 grams of cannabis (Ill. Rev. Stat. 1983, ch. 56½, par. 705(e)) and unlawful possession of a controlled substance, less than 15 grams of LSD (Ill. Rev. Stat. 1983, ch. 56½, par. 1402(b)), and Koniecki was further charged with unlawful possession with intent to deliver more than 30 grams of cocaine (Ill. Rev. Stat. 1983, ch. 56½, par. 1401(a)(2)), unlawful possession of more than 30 grams of a controlled substance, cocaine (Ill. Rev. Stat. 1983, ch. 56½, par. 1402(a)(2)), and unlawful possession of a firearm without the requisite firearm owner's identification card (Ill. Rev. Stat. 1983, ch. 38, par. 83—2). Motions to quash arrest and suppress evidence were filed by the defendants and, following an evidentiary hearing, were granted by the trial court. The State brings this interlocutory appeal pursuant to Supreme Court Rule 604(a)(1) (87 Ill. 2d R. 604(a)(1)).

The issue raised is whether the decision of the trial court suppressing the evidence was manifestly erroneous. Although no appellate brief has been filed by defendant, the question presented can be decided on the merits without the aid of an appellee's brief. *First Capitol Mortgage Corp. v. Talandis Construction Corp.* (1976), 63 Ill. 2d 128, 345 N.E.2d 493.

The evidence adduced at the hearing on the motion to suppress, all through the testimony of police officers, is summarized as follows. On August 10, 1983, at approximately 4:45 a.m. defendant Holk appeared at the city of Highwood police station in a disheveled, frightened, and disoriented state. She was breathing heavy, was red in the face, and her knees were red and dirt-covered. She said she had been

attacked and had difficulty in responding to questions. She also said "they" attacked her. She then commented that her boyfriend was trying to kill her "because of drugs." She finally stated she lived on Naida Street in Highland Park, although she repeatedly failed to answer questions. The Highland Park police were called and arrived within 15 minutes. Holk again related someone was trying to kill her and appeared very paranoid when they left to go to the Highland Park police station.

At the Highland Park police station, Holk was still emotional, fearful, and unresponsive to questioning. Lieutenant Rash of the Highland Park police department was called to the station because he lived across the street from Holk. He knew that Koniecki and Holk lived there and had, on several occasions, seen strange behavior by both of them and was familiar with several domestic violence calls from them to his department. He also was aware that Holk had previously received psychiatric treatment. Holk was still agitated and fearful and repeatedly told Rash that "he's going to kill me," although she did not mention Koniecki specifically. When asked where Koniecki was, she replied that she did not know. Rash then dispatched other officers to go to her residence because he was concerned that Koniecki might be injured or dead. The officers were told to check on the well-being of the man living there.

Officers Cameron and Cohen of the Highland Park police department were dispatched to Holk's residence and arrived at 6 a.m. They were told to check the well-being of the resident inside, Dennis Koniecki. A Mercedes, used by both Holk and Koniecki, was in the driveway, and a large dog, in front of the front door, was barking and growling at them. The animal warden was called. He arrived in about 15 minutes and assisted in placing the dog inside the Mercedes. The officers then approached the front door and were confronted by a second dog that was inside the door. This dog was barking and growling as well. The officers knocked and called, but received no response. No lights were on. They then walked around the house and entered an unlocked breezeway door. They first went into the basement to check whether anyone was there. Officer Cameron observed dirt and dog debris on the floor along with some brown, plant-like substance. He saw a desk which had a large scale on it and some brown and green plant-like substance on it. He then observed five large plastic garbage bags, two of which were open at the top, that contained more green and brown plant-like substances. He did not open them. The officers left the basement and were unable to search the rest of the home because of the dog.

Lieutenant Rash was again contacted, and he had Holk brought to the residence to assist in getting the dog out. Once the dog was removed, Cameron and Lieutenant Largo entered the residence through the front door. They found no one on the first floor. Cameron did observe a piece of U.S. currency, which was tightly rolled with a white powder substance on the tip of the currency. No one was found on the second floor. On a table in the study Cameron saw a small gram-type scale with a white powder residue on the weighing portion of the scale. He also observed on the table a larger ash tray with a spoon with an elongated handle. Nothing was seized.

After finding no one inside the residence, Cameron and Lieutenant Largo exited the house. Cameron then walked around the residence to the breezeway by himself and went into the basement a second time to examine the garbage bags. Although at the time he was first in the basement he did not suspect marijuana was in the bags, after the search of the rest of the house and from what he observed, he now felt contraband might be in the bags. He examined the bags and believed them to contain "possibly marijuana." He called other officers, who confirmed the bags contained marijuana. The officers then went outside to secure the residence and await a search warrant.

Lieutenant Rash then told other officers to take Holk to the hospital because of her mental condition, and to arrest her for possession of marijuana if she was released. While the officers were awaiting a search warrant, Koniecki arrived and was arrested for possession of marijuana. Holk was taken to Highland Park Hospital, where she was examined by Dr. Kontrick. He told Officer Cohen that Holk was not suicidal and had personal problems. She was not admitted and was free to go. Cohen then advised her that she was under arrest for felony possession of marijuana and she was taken to the Highland Park police station.

At approximately 9 a.m., while she was being processed during the booking procedure, Holk was asked to sign a consent to search form for her residence. She said "I don't care," and signed the form after reading it. The officers felt that at this time she was calm and understood what she was doing. The search of the residence was conducted after a search warrant and the consent to search were obtained.

The trial court found the police officers' testimony to be credible and that they did not enter the residence for any purpose other than to check on the well-being of the occupant. However, the court concluded that there was neither probable cause to believe there was an injured person in the premises nor were there "exigent circum-

stances" for the officers to act without first securing a warrant. The court also found that even assuming the initial entry was proper, Officer Cameron's reentry after the search for any injured person had concluded was illegal. Further, the consent to search was held to be involuntary under all the circumstances. The motions to suppress by both defendants were granted.

■■ The crux of the State's argument on appeal is that the initial entry and search of the residence by the police was pursuant to a reasonable belief that an injured person may have been inside the house. The State contends that under this circumstance, the lack of a search warrant was excused by the "exigent circumstances doctrine." The State further maintains that the subsequent search and seizure of evidence in the residence was justified because of a "valid consent authorized by defendant Holk."

Our analysis begins with an examination of the question of the initial entry into and the search of the residence by the police without a warrant. It is axiomatic that the physical entry of the home is the chief evil to which the wording of the fourth amendment is directed, and a principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the fourth amendment on agents of the government who seek to enter the home for purposes of search or arrest. (*Welsh v. Wisconsin* (1984), 466 U.S. 740, 748-49, 80 L. Ed. 2d 732, 742, 104 S. Ct. 2091, 2100.) Thus, it has been decided that warrantless felony arrests in the home are prohibited by the fourth amendment, absent probable cause and exigent circumstances. (*Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371.) It has also been separately recognized that the fourth amendment does not bar police officers from making warrantless entries and searches when they "reasonably believe that a person within is in need of immediate aid." (*Mincey v. Arizona* (1978), 437 U.S. 385, 392, 57 L. Ed. 2d 290, 300, 98 S. Ct. 2408, 2413; see 2 W. LaFave, Search & Seizure sec. 6.6(a) (1978).) And, the police may seize any evidence that is in plain view during the course of their legitimate emergency activities. *Mincey v. Arizona* (1978), 437 U.S. 385, 393, 57 L. Ed. 2d 290, 300, 98 S. Ct. 2408, 2413.

In Illinois, reviewing courts have adopted the "exigent circumstances" rule as it applies to the entry into private premises in order to effectuate a warrantless felony arrest (*People v. Abney* (1980), 81 Ill. 2d 159, 407 N.E.2d 543), and have recognized an "emergency" exception to the search warrant requirement whereby police may make a warrantless entry into private premises if they reasonably believe an emergency exists which dictates the need for immediate action for

the purpose of providing aid to persons or property in need thereof. (*People v. Bondi* (1984), 130 Ill. App. 3d 536, 539-40, 474 N.E.2d 733; *People v. Meddows* (1981), 100 Ill. App. 3d 576, 579-81, 427 N.E.2d 219, and cases and authorities cited therein.) Although the court below and the State in its appellate brief appear to refer to the "exigent-circumstances" rule applicable to arrest situations, the circumstances here in which a warrantless entry was made to determine the well-being of the resident more properly fall within the "emergency" exception to the warrant requirement category of cases. In these latter cases, we are generally concerned with an exception to the search warrant requirement as contrasted with the arrest warrant requirement involved in *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371, and *People v. Abney* (1980), 81 Ill. 2d 159, 407 N.E.2d 543. See *Michigan v. Tyler* (1978), 436 U.S. 499, 509, 56 L. Ed. 2d 486, 498, 98 S. Ct. 1942, 1950.

Under the "emergency" exception to the warrant requirement, the reasonableness of the belief that an emergency, a situation requiring immediate action, exists is determined by the entirety of all the circumstances known to the police at the time of the entry. (*People v. Meddows* (1981), 100 Ill. App. 3d 576, 580, 427 N.E.2d 219; see generally 2 W. LaFave, Search & Seizure sec. 6.6(a) (1978).) The purpose, to offer assistance to a citizen possibly imperiled, not to obtain evidence of a crime, justifies such a search. *People v. Meddows* (1981), 100 Ill. App. 3d 576, 580, 427 N.E.2d 219.

In the case at bar, we note first that the trial judge specifically found the testimony of the police officers regarding their reason for entry into the residence, to determine the well-being of the occupant, to be credible. Nevertheless, the trial judge found the entry illegal on an erroneous application of a probable cause test, plus exigent circumstances, which are relevant where entry into a residence is made for the purpose of making an arrest without warrant. Thus, the credibility of the police officers' stated purpose in entering the residence, to determine the well-being of the occupant, was accepted by the trial judge and, on this record, there is no other testimony to the contrary. Accordingly, we focus on the reasonableness of the police officers' belief that under the facts here an emergency situation existed which required the immediate action of entry into the premises without first obtaining a search warrant.

At approximately 4:45 a.m., Holk first appeared at the Highwood police department in her confused, fearful, and disoriented state, and she first reported that she had been attacked. Within 15 minutes Highland Park police arrived and took over the investigation. Holk

was still fearful, did not respond to many questions, and was still vague about who was trying to kill her and what had happened before she appeared at the police station. Lieutenant Rash, a neighbor of Holk's, was then summoned to the station. After talking with Holk, learned she was fearful and she thought someone was trying to kill her, and knowing that Holk and Koniecki had previous domestic arguments for which the police were called, Rash became concerned that Koniecki might be injured or dead. He then sent other officers to the residence of Holk and Koniecki to check on Koniecki's well-being.

At approximately 6 a.m., Officers Cameron and Cohen arrived at the residence and received no response to their knocking at the door and calls to any occupant. Barking dogs had to be removed from the house. An automobile was present in the driveway. At approximately 6:20 a.m., the officers made their initial entry into the basement and a short while later, after removal of the second dog from the first floor, were able to conduct a complete search of the residence for an occupant. No one was found inside the house, nothing was seized at this time, and all the officers exited the residence. At this point, the purpose of the initial search of the residence, to determine the well-being of the occupant, ended. Under all these circumstances, we conclude that this initial search of the residence without a search warrant was justified by the police under a reasonable belief that an emergency existed requiring immediate action.

However, even though the initial entry into the residence was justified under the "emergency" exception to the warrant requirement, and the search of the basement and entire residence was limited to achieving the objective which justified the entry, the second entry into the basement by Officer Cameron, during which he first determined that the garbage bags contained marijuana, must be separately analyzed for its legality.

■ While the United States Supreme Court has delineated some exceptions to the fourth amendment warrant requirement (see *Texas v. Brown* (1983), 460 U.S. 730, 735-36, 75 L. Ed. 2d 502, 509, 103 S. Ct. 1535, 1539), the court has also narrowly confined these exceptions to specific factual situations. (See *Mincey v. Arizona* (1978), 437 U.S. 385, 393, 57 L. Ed. 2d 290, 300, 98 S. Ct. 2408, 2414.) The conduct of the officer entering the premises without a warrant under the guise of an "exception" must always be consistent with the purported reason for the warrantless entry. (*People v. Bondi* (1984), 130 Ill. App. 3d 536, 539, 474 N.E.2d 733.) It is clear from this record that the second entry by Officer Cameron was not for the purpose of determining whether the emergency situation continued. On the contrary, it had al-

ready been determined by Officer Cameron and his superiors that there was no one in the house in any danger. His sole purpose in reentering the premises was to determine whether the substance in the bags in the basement were contraband. Thus, the second entry and search of the basement were illegal.

We note that this is not a case where, during the initial legal search, contraband was recognized and seen in "plain view," and thus subject to immediate seizure. (*Illinois v. Andreas* (1983), 463 U.S. 765, 771, 77 L. Ed. 2d 1003, 1010, 103 S. Ct. 3319, 3324.) For an item to be legally seized when in "plain view," the officer first must be properly on the premises under a warrant or an exception to the warrant requirement. (*People v. Caserta* (1984), 123 Ill. App. 3d 608, 612, 463 N.E.2d 190.) Further, it must be immediately apparent to the officer that the items observed "may be evidence of a crime, contraband, or otherwise subject to seizure." (*Texas v. Brown* (1983), 460 U.S. 730, 737, 75 L. Ed. 2d 502, 510, 103 S. Ct. 1535, 1540.) In this case, Officer Cameron did not identify the substance in the plastic bags as marijuana during his initial, valid search of the basement pursuant to the emergency. Rather, he had to return to the basement after the emergency ceased to determine whether the substance was contraband.

We also need not analyze whether the search was proper under the search warrant which was obtained following the second entry into the home by Cameron. The State acknowledges that the affidavit for the warrant was based upon this second entry into the basement and that the second entry was not justified, thus tainting the search warrant. Instead, the State seeks to justify the subsequent seizure based upon the written consent executed by Jaclyn Holk. The State argues that the subsequent, voluntary consent itself operates as a "total bar to the fourth amendment" requirement of probable cause for search, and cannot be tainted by the prior, illegal act of the second entry into the residence.

First, a search that is conducted pursuant to consent is one of the specifically established exceptions to the requirements of both a warrant and probable cause. (*Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 219, 36 L. Ed. 2d 854, 858, 93 S. Ct. 2041, 2043-44.) A warrantless search conducted pursuant to a valid consent is permitted as long as it can be established that the consent was given voluntarily. (412 U.S. 218, 222, 36 L. Ed. 2d 854, 860, 93 S. Ct. 2041, 2045; see, *e.g., People v. Bean* (1981), 84 Ill. 2d 64, 417 N.E.2d 608; *People v. Lentini* (1982), 106 Ill. App. 3d 695, 435 N.E.2d 1280.) Voluntariness of a consent depends on the totality of the circumstances, and it is the State's

burden to demonstrate that the consent was voluntarily given. (*People v. Smith* (1984), 124 Ill. App. 3d 914, 920, 464 N.E.2d 1206.) Voluntariness of a consent is a factual determination, and a reviewing court will not disturb a trial court's finding in a hearing on a motion to suppress unless the trial court's finding was manifestly erroneous. *People v. Long* (1983), 99 Ill. 2d 219, 231, 457 N.E.2d 1252; *People v. Wolfbrandt* (1984), 127 Ill. App. 3d 836, 842, 469 N.E.2d 305.

Second, voluntary consent, even if established, will not by itself purge "tainted" conduct and attenuate a subsequent search or seizure from prior illegal conduct. (*People v. Odom* (1980), 83 Ill. App. 3d 1022, 404 N.E.2d 997.) In *Odom*, the court relied on the factors set forth by the United States Supreme Court in *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254, to determine whether a person could voluntarily consent to a search if suffering under an illegal arrest. (*People v. Odom* (1980), 83 Ill. App. 3d 1022, 1028, 404 N.E.2d 997.) The factors were: the giving of *Miranda* warnings, the time span between the arrest and the consent, the presence of intervening circumstances, the purpose of the officer's illegal acts, and the flagrancy of the officer's conduct. (83 Ill. App. 3d 1022, 1028, 404 N.E.2d 997.) We agree with the *Odom* court's adoption of the *Brown* factors, which were applied in the context of an illegal arrest and a subsequent confession in *Brown*, to be utilized in cases such as this which involve a consent to search given after an illegal search and a subsequent illegal arrest. See also 2 W. LaFave, Search & Seizure sec. 8.2(d) (1978).

■ Addressing first the voluntariness of Holk's consent, we do not find the trial judge's determination that the consent was not voluntary to be manifestly erroneous under the circumstances. From this record, it is apparent that Holk was under considerable emotional stress for several hours after she first appeared at the police station. She remained confused, fearful and emotional. Just one hour before she gave her purported consent, the police had felt her mental condition to be such that she should be taken to a hospital. Prior to the giving of her consent, Holk was not given *Miranda* warnings or told that she had a right to refuse consent. Moreover, prior to the consent, the illegal search had uncovered marijuana and Holk was under arrest for possession of marijuana, making the purported consent nothing more than a submission or resignation to police authority. (See 2 W. LaFave, Search & Seizure sec. 8.2(d), at 653 (1978).) Under all these circumstances, despite the testimony of the police that Holk was calm · and understood what she was doing when she signed the consent, there was ample evidence for the trial judge to conclude that Holk's

consent was not voluntary. This determination is not manifestly erroneous.

■ Even assuming the consent was voluntary; the consent, under the facts here, was obtained by the exploitation of the prior illegal search and illegal arrest based thereon, and cannot be said to have been obtained by means sufficiently distinguishable to be purged of the preliminary taint. (See *People v. Odom* (1980), 83 Ill. App. 3d 1022, 404 N.E.2d 997.) The consent was obtained in close temporal proximity to the illegal activity, *i.e.* two hours after the illegal search and within one hour of Holk's illegal arrest. No intervening circumstances attenuate the taint of the illegal police activity. We conclude that Holk's consent was obtained by exploitation of the illegal police conduct. Therefore, the seizure of the contraband in the residence based upon Holk's consent was illegal. As the defendant Koniecki's arrest also was based on the second illegal entry into his residence and the subsequent seizure of the contraband based on the consent which we hold to be invalid, the trial judge properly granted the motions to suppress filed by both defendants herein.

For the foregoing reasons, the judgment below is affirmed.

Affirmed.

HOPF and SCHNAKE, JJ., concur.