THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. JAMES SPEER *et al.*, Defendants-Appellees.

Second District   No. 2—87—1191

Opinion filed June 22, 1989.

Fred L. Foreman, State's Attorney, of Waukegan (William L. Browers and Cynthia N. Schneider, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

G. Joseph Weller and Barbara Paschen, both of State Appellate Defender's Office, of Elgin, for appellee James Speer.

Theodore S. Potkonjak, of Smoker & Starck, of Waukegan, for appellee Christopher Kucharski.

JUSTICE DUNN delivered the opinion of the court:

Defendants, James Speer and Christopher Kucharski, were charged with unlawful possession of less than 15 grams of a controlled substance (cocaine); unlawful possession with intent to deliver more than 5 but less than 15 grams of a substance containing cocaine; unlawful possession of more than 30 but less than 500 grams of cannabis; unlawful possession with intent to deliver more than 30 but less than 500 grams of cannabis; unlawful possession of less than 15 grams of a controlled substance containing lysergic acid diethlamide; unlawful possession of less than 15 grams of a controlled substance containing diazepam; and possession of a firearm without a firearm owner's identification card.

These charges were brought as a result of evidence seized by the police after a warrantless search of defendants' apartment. Defendants moved to suppress the evidence, and after a suppression hearing, this motion was granted. The State's motion to reconsider was denied. The State filed a certificate of impairment pursuant to *People v. Young* (1980), 82 Ill. 2d 234, 247, to allow an appeal under Supreme Court Rule 604(a)(1) (107 Ill. 2d R. 604(a)(1)), and now raises three issues on appeal: (1) whether the warrantless search of the apartment was permissible under an emergency exception to the warrant requirement where police reasonably believed a woman in the apartment was suffering from a drug overdose; (2) whether the warrantless search was permissible due to consent by one with apparent authority; and (3) whether the warrantless search was permissible under a theory of ratified authority where a resident of the apartment consented after an unauthorized person gave consent. For the reasons stated below, we reverse.

The following evidence was introduced at the suppression hearing. Becky Kuzmickus testified as follows: On June 16, 1987, she received a phone call from the mother of Denise Lopez, who told her that Denise had called and asked her to call Kuzmickus to tell her that her daughter, Nina Sanchez, was overdosed on narcotics. Kuzmickus said she was alarmed by this call. She went to Denise Lopez's home to meet Denise, who was going to take her to Nina. When Kuzmickus arrived at Denise's, Denise was not there. Denise's boyfriend was there and told Kuzmickus where she could find Nina. At this point Kuzmickus called police detective Marty Grum on his pager. (Kuzmickus was acquainted with Detective Grum, and he had given her his pager number in case she ever needed his assistance.) Kuzmickus stated she called Detective Grum because she was afraid to go to the residence alone. Kuzmickus told him she thought her daughter was in serious condition. Detective Grum told her that because he was off duty he would have to call a uniformed officer for assistance. He also told her that since Nina was 20, if she did not want to leave the premises, he could not force her. He told Kuzmickus he would accompany her to make sure nothing happened to her. He told her to meet him at a street corner, and they would go to the residence.

Kuzmickus, along with her husband, met Detective Grum on a street corner at Tenth and Jackson and proceeded to 920 South Jackson, the address at which Kuzmickus was told Nina was overdosed. The three were also accompanied by a Waukegan police officer. When they arrived at the residence, one of the officers knocked on the door, and a man answered. The officer asked if Nina Sanchez was inside,

and the man replied no, he had dropped her off in Grayslake. Kuzmickus testified that Nina's car was out back behind the residence. An officer asked if they could come inside. The man said fine and let them in. Upon entering the apartment, the officers asked who owned the apartment and asked again if they could look around. Defendant Speer replied yes. Kuzmickus and her husband looked through the different rooms in the apartment, but did not find Nina.

Detective Marty Grum testified as follows: He received a call at about 10 a.m. from Kuzmickus, who told him she had been informed that her daughter was unconscious due to an excessive amount of narcotics, and she was lying in only her underwear on the floor of an apartment where there were several men. She told him she believed her daughter's safety was in jeopardy. Grum told her to determine the exact location where she believed her daughter was located. He was not certain whether the location was in Waukegan or North Chicago. He called the North Chicago police department to tell them he might need its assistance. Grum also called the Waukegan police department, who dispatched Officer Paul Hansen to the corner where Grum was to meet Kuzmickus. At the corner, Detective Grum explained to Officer Hansen what Kuzmickus had told him, and they proceeded to the residence. They arrived at the residence at approximately 11 a.m.

At the residence, Officer Hansen knocked on the door, and David Sanchez opened it about 90 degrees. Detective Grum could not see any drugs or drug paraphernalia from this vantage point. Officer Hansen asked Sanchez if Nina was in the apartment. He said she was not. Then Officer Hansen asked Sanchez if he lived in the apartment, and Sanchez responded that he did. Sanchez said they could enter, and they stepped inside. From inside the doorway in the living room, Detective Grum could see into the kitchen, where he saw a glass pipe with white residue. Officer Hansen then asked if anyone else lived in the apartment. Sanchez said that defendant Speer lived in the apartment. Detective Grum asked Speer if they could look for Nina, and he said go ahead. Detective Grum walked through the apartment with Kuzmickus behind him and looked into each room for Nina. He observed two rifles, a shotgun, and a handgun in a bedroom. In the kitchen he observed another glass pipe, a pair of forceps, and a mirror with white residue on it. He also saw a white powder on top of the kitchen cabinet and a bag with a green leafy substance in the bottom cabinet, which was partly open. After making these observations, Detective Grum returned to the living room and informed Officer Hansen, who called for assistance.

Officer Paul Hansen testified as follows: He was dispatched to

meet Detective Grum at the corner of Tenth and Jackson. The dispatcher did not tell him that he was to investigate a possible overdose. He learned about the possible overdose when he met Detective Grum and Ms. Kuzmickus and her husband at Tenth and Jackson. Detective Grum and Nina's parents indicated that Nina could be in danger. The parents were distraught and concerned. The four proceeded to 920 South Jackson, and, after a knock on the door, David Sanchez answered. Detective Grum asked him if Nina was inside. He told Sanchez he had been told that Nina was passed out on the floor in her underwear intoxicated from drugs, and they were concerned about her well-being. Sanchez told him he had taken her home to Grayslake. At this point Officer Hansen still believed Nina could be in the residence in distress. He asked Sanchez if he lived in the apartment and if they could come inside. Sanchez answered yes to both questions. Officer Hansen and Detective Grum entered the apartment. Officer Hansen saw defendant Speer lying on the couch in the living room and asked him if he lived in the apartment. Speer told him he did and gave him permission to look around. Officer Hansen and Detective Grum looked around the apartment for Nina and did not find her. Detective Grum pointed to some drug items on the kitchen table. Officer Hansen observed the items and called for assistance.

David Sanchez testified as follows: He answered the door to defendants' apartment and was asked by a police officer if Nina was inside. He stated that she was not, that he just took her home. An officer asked permission to come inside, and he turned around to wake up defendant Speer. At this point the police came inside. He had not told the police that they could enter. After they came through the door they began talking to defendant Speer. Sanchez said he never lived in this apartment.

Defendant Speer testified as follows: He was sleeping on the living room couch when he was awakened by a uniformed police officer and Nina's mother and father walking past the couch. He asked what was going on. He said they began looking through the apartment, and at some point an officer stated that they were looking for Nina. Detective Grum stood inside the doorway. Detective Grum recognized Denise Lopez, who was sitting on a chair in the living room and made some greeting to her. Speer said no one asked him for permission to search his house, but he did later sign a consent form to search presented to him by an officer other than Grum or Hansen after the two officers had searched the apartment.

Defendant Kucharski testified as follows: He lived at 920 South Jackson with defendant Speer. He was in the kitchen when the police

came to the door. He went into the living room and observed the police speaking with David Sanchez. He heard an officer ask if they could come inside. He could not clearly hear what Sanchez said to the officer, but he never heard Sanchez give permission to come in. He saw Sanchez turn around toward Speer, and the police followed him right in. They asked Speer if they could come in, and he replied sarcastically, "Hey, you're already here." Kucharski was never asked for permission to search the apartment and never told the officers they could do so.

After hearing the evidence the trial court granted defendants' motion to suppress the evidence seized in defendants' apartment, holding that the initial warrantless entry to defendants' apartment violated the fourth amendment. The court found that the facts did not support an exigent circumstances exception to the warrant requirement because there was no probable cause to believe a crime was committed. The trial court also found that David Sanchez did not consent to a search which would intrude upon the apartment residence and that he had no authority to consent because he was a social guest. Finally, the court held that defendant Speer's consent made after the officers were inside the residence did not validate the search because the officers saw the drug paraphernalia just after they stepped in the apartment and before Speer consented.

■■ ■ We first address the second issue raised by the State, whether there was consent to search the apartment. The State contends that the search of defendants' residence was valid because David Sanchez, who answered the door, consented to the search. It is well recognized that a search may be conducted without a warrant, if done with consent. (*Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 222, 36 L. Ed. 2d 854, 860, 93 S. Ct. 2041, 2045.) Consent need not be obtained from the defendant himself; it is valid if obtained from a third party who possessed common authority over, or other sufficient relationship to, the premises. (*United States v. Matlock* (1974), 415 U.S. 164, 170, 39 L. Ed. 2d 242, 249, 94 S. Ct. 988, 993.) Defendants argue that the trial court found that Sanchez did not consent to the search, and we may not reverse this finding unless it is contrary to the manifest weight of the evidence. We need not decide whether this finding is contrary to the manifest weight of the evidence because under Illinois law, even if Sanchez did consent to the search, it would be invalid because Sanchez did not have authority to consent. It is undisputed that Sanchez did not live at the apartment, and there was no evidence to suggest that he was anything more than a social guest. Thus, he did not possess common authority or have some other suffi-

cient relationship to the apartment to validate a search by the police.

■ The State argues that because it appeared Sanchez had authority, the search passes constitutional muster. The Supreme Court has never decided whether a search may be valid where the person who consented appeared to have authority to consent, though several lower courts have recognized that a search made after consent by one with apparent authority does not violate the fourth amendment. (See 3 W. LaFave, Search and Seizure, §8.3(g) (2d ed. 1987).) Nonetheless, the Illinois Supreme Court has considered and rejected the apparent authority doctrine (*People v. Miller* (1968), 40 Ill. 2d 154), and this court recently held in accordance with this opinion in *People v. Vought* (1988), 174 Ill. App. 3d 563. Accordingly, we decline to find the search valid under a doctrine of apparent authority.

■ Next, we find no merit to the third issue raised by the State, whether the search was constitutional under a theory of ratified consent. The State argues that though Sanchez did not have authority to consent, his consent was ratified by Speer, who was a resident, when Speer gave his consent to search after the police stepped into the apartment. The State has not cited, nor are we aware, of any case law which has applied this agency principle of ratification to the issue of consent to search. Suffice it to say, we are not persuaded to adopt such a novel theory.

■ Finally, we address the State's first contention on appeal, that the warrantless entry to defendants' apartment was legal under the emergency exception to the warrant requirement where the police had a reasonable belief that a woman inside the apartment was in danger from a drug overdose. Defendant Kucharski argues that this issue is waived because it was not raised at the suppression hearing and was not raised in the State's motion for reconsideration. We disagree. The trial court interrupted the prosecutor in the beginning of his argument to tell him that he did not believe the emergency exception was applicable to this case. Thus, the prosecutor cannot be held to have waived this issue below. Secondly, we know of no rule, statute, or case which requires this court to find an issue waived, as in the case of a post-trial motion, where the State did not raise an issue in a motion to reconsider a suppression order.

■ A warrantless search of a home is presumptively an unreasonable search in violation of the fourth amendment. (*Payton v. New York* (1980), 445 U.S. 573, 586, 63 L. Ed. 2d 639, 651, 100 S. Ct. 1371, 1380.) The Supreme Court has recognized an "emergency" exception to the warrant requirement in instances where police officers "reasonably believe that a person within is in need of immediate aid."

(*Mincey v. Arizona* (1978), 437 U.S. 385, 392, 57 L. Ed. 2d 290, 300, 98 S. Ct. 2408, 2413.) Illinois courts, including this court, have repeatedly recognized this exception in cases where officers reasonably believe an emergency exists which dictates the need for immediate action to provide aid to persons or property in a home. (*People v. Koniecki* (1985), 135 Ill. App. 3d 394, 399; *People v. Bondi* (1984), 130 Ill. App. 3d 536, 539-40; *People v. Meddows* (1981), 100 Ill. App. 3d 576, 579-81.) During the course of their legitimate emergency activities, the police may seize any evidence that is in plain view. *Mincey v. Arizona* (1978), 437 U.S. 385, 393, 57 L. Ed. 2d 290, 300, 98 S. Ct. 2408, 2413.

■ The trial court held that the exigent circumstances exception did not apply to this case because there was no probable cause to believe a crime had been committed within the residence. In emergency cases such as the one presented here, however, where the police testified that the purpose of entering the residence was to check on the welfare of a person, rather than to make an arrest or search for evidence, the issue is not whether there was probable cause to believe a crime had been committed, but whether the police reasonably believed that an emergency existed which required them to act immediately to provide aid to someone in the residence. *Koniecki*, 135 Ill. App. 3d at 399.

The trial court found that the officers were not attempting to gain entry to the residence for a purpose other than checking on Nina Sanchez, the woman believed to have overdosed. The judge stated that he did not believe this was a "masquerade attempt" to enter the residence to search for narcotics, and he found that the officers "reasonably" told the person answering defendants' door that they were looking for Nina Sanchez. It is clear that the trial court believed that the officers entered defendants' residence for a purpose other than to search or arrest. But, the court failed to make a finding on whether the police had a reasonable belief that they were faced with an emergency.

■ Ordinarily, a trial court's ruling will not be disturbed on appeal unless it is manifestly erroneous. (*People v. Hardin* (1989), 179 Ill. App. 3d 1072, 1075.) When the facts are undisputed, however, an appellate court may review the evidence *de novo*. (*Hardin*, 179 Ill. App. 3d at 1075.) We find the facts going to the emergency exception undisputed, and, therefore, we will make our own determination of whether the facts support the application of the emergency exception in this case.

■ As already stated, for a warrantless search to be found per-

missible under the emergency exception, the State must show that the officers had a reasonable belief that a person within was in need of immediate aid. (*Koniecki*, 135 Ill. App. 3d at 399.) The reasonableness of the belief that an emergency exists is determined by the entirety of all the circumstances known to the police at the time of entry. (*Koniecki*, 135 Ill. App. 3d at 399; *Meddows*, 100 Ill. App. 3d 576; see generally 2 W. LaFave, Search and Seizure, §6.6(a) (2d ed. 1987).) There is no simple test for determining whether an officer's belief that an emergency existed is reasonable; however, we find Chief Justice (then judge) Burger's comments in his opinion in *Wayne v. United States* (D.C. Cir. 1963), 318 F.2d 205, 212, a helpful introduction to our analysis.

> "[A] warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. Fires or dead bodies are reported to police by cranks where no fires or bodies are to be found. Acting in response to reports of 'dead bodies,' the police may find the 'bodies' to be common drunks, diabetics in shock, or distressed cardiac patients. But, the business of policemen and firemen is *to act*, not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process. Even the apparently dead often are saved by swift police response. A myriad of circumstances could fall within the terms 'exigent circumstances' [citation], *e.g.*, smoke coming out a window or under a door, the sound of gunfire in the house, threats from inside to shoot through the door at police, reasonable grounds to believe an injured or seriously ill person is being held within." (Emphasis in original.)

In this case, the State contends the police entered defendants' residence under the reasonable belief that a woman inside the residence had overdosed on narcotics. Detective Grum testified he received a call on his pager from Becky Kuzmickus. He said Kuzmickus told him she was concerned for her daughter's safety; she had been told that her daughter, Nina Sanchez, was overdosed on narcotics and was lying unconscious in only her underwear on the floor of a residence where there were several men. Kuzmickus corroborated this testimony. Detective Grum also communicated this information to Officer Hansen. The record establishes that the only other circumstance

known to the officers at the time of entry is that David Sanchez, who answered defendants' door, stated that Nina was not in the apartment, that he had taken her home.

We believe that the circumstances known to the officers were sufficient to create a reasonable belief that Nina Sanchez was in serious danger and in need of immediate assistance. The information Kuzmickus told Detective Grum alerted him to a potentially life-threatening situation. It cannot be disputed that a person overdosed on narcotics is likely to be dangerously ill and in need of immediate assistance. It also cannot be disputed that time is of the essence in treating the victim of a narcotics overdose. As stated in *La Fournier v. State* (1979), 91 Wis. 2d 61, 280 N.W.2d 746, 749, where the Wisconsin court held it proper for a police officer to enter a dwelling in response to a telephone call that reported a drug overdose, "[a] victim of drug overdose clearly presents an emergency of sufficient proportion to render a warrantless entry 'reasonable.' "

Also, we do not believe that David Sanchez's statement that he took Nina home was sufficient to dissipate the reasonable belief that Nina was in danger. If Nina had been inside and in danger from an overdose or anything else, it is not at all certain that someone answering the door would readily admit this to the police, at least in this situation, where no one in the apartment called the authorities requesting assistance for Nina. We note also that Nina's mother testified that her daughter's car was out back behind the apartment.

Next, we address defendants' contention that the officers did not actually believe Nina was in need of immediate assistance when they entered the apartment. Defendant Speer suggests that this was merely an instance where the police were assisting a mother who wanted to remove her "errant" daughter from defendants' residence. We disagree. First, we point out that the State need not show that the officers believed with certainty that Nina was in need of immediate assistance. Again, as stated in *Wayne v. United States* (D.C. Cir. 1963), 318 F.2d 205, 212,

> "[T]he business of policemen and firemen is *to act*, not to speculate or mediate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process." (Emphasis in original.)

(See also *People v. McGee* (1986), 140 Ill. App. 3d 677, 681-82.) Second, we reiterate that the officer's reasonable belief is determined by the totality of the circumstances known to the officer at the time of entry. (*Koniecki*, 135 Ill. App. 3d at 399.) Thus, in determining

whether the officers had an actual reasonable belief, we are concerned only with what the officers knew at the time of entry. With these principles in mind, we review the factors defendants contend prove the officers did not actually believe there was an emergency situation.

Defendants note that Kuzmickus, after receiving the call from Denise Lopez's mother, did not at first call Detective Grum. She first went to the home of Denise Lopez because Denise was to show her to the residence where Nina was located. It was not until she got to Denise's and found Denise not there that she called Detective Grum. Defendants also point to the statement made by Kuzmickus that she called Detective Grum to make sure nothing happened to her when she went to check on her daughter. Defendants add that Kuzmickus did not call for medical assistance.

These factors do not disprove the officers' reasonable belief for two reasons. First, we do not believe that Kuzmickus's conduct demonstrates that she did not believe her daughter was in need of immediate assistance. The evidence established that Kuzmickus was distraught and concerned. That she hesitated in involving the police and did not call for medical assistance does not disprove her belief that her daughter was in need of immediate aid. Kuzmickus acted as soon as she heard about Nina by going to Sanchez's home to meet Denise Sanchez. It may be that she hesitated in calling the authorities because she believed her daughter took illicit drugs. At any rate, the conduct and motives of Kuzmickus are not relevant to this analysis since there is no evidence to indicate that Detective Grum or Officer Hansen was aware of these facts. The evidence shows that the officers knew at the time of entry only the information Kuzmickus learned from the phone call and that Kuzmickus stated she believed her daughter was in serious danger.

Defendants also point to a statement made by Detective Grum where he told Kuzmickus he could not force Nina to leave the premises if she was not intoxicated and no harm had come to her. Kuzmickus testified Detective Grum told her he could not force Nina to leave the premises if she did not want to leave, but he would go with Kuzmickus to make sure nothing happened to Kuzmickus. This statement does not prove that Detective Grum lacked a reasonable belief that there was an immediate need to enter the premises to check on Nina. It proves only that he was not certain that Nina was overdosed.

Defendants also note that approximately one hour passed from the time Kuzmickus called Detective Grum and the time they arrived at defendants' residence. We do not believe this factor has anything to do with the the belief of the officers in this case. There is nothing in

the record to indicate that the officers did not act as swiftly as possible as soon as they learned of the overdose report. Thus, the fact that it took them an hour to respond does not prove that they believed this was not an emergency.

The only other information which the record discloses that Detective Grum and Officer Hansen were aware of at the time of entry is that Sanchez, who answered the door, stated he took Nina home. There is nothing in the record to indicate that Detective Grum was satisfied by this statement that Nina was not in danger. Moreover, Officer Hansen testified that he still believed after Sanchez's statement that Nina could be inside in danger.

We find that the evidence shows that the officers had an actual reasonable belief that there was an immediate need to enter defendants' apartment to aid Nina Sanchez. The officers were informed that Nina was overdosed at this location, and their conduct demonstrates that they took this information seriously. We do not believe that the factors discussed by defendants prove that the officers believed this was merely a case of helping a mother get her errant daughter home. The record indicates that the concern was that Nina was overdosed. None of the factors mentioned by defendants sufficiently prove otherwise.

Our finding that the facts here are sufficient to support a finding of an emergency exception to the warrant requirement is consistent with two of our recent opinions concerning the emergency exception. In *People v. Koniecki* (1985), 135 Ill. App. 3d 394, we found the following facts justified a reasonable belief by the police that an emergency existed requiring immediate action: Defendant's girlfriend appeared at a police station at approximately 4:45 a.m. in a disheveled and disoriented state complaining she had been attacked by defendant, who was trying to kill her. An officer was called to the station who lived across the street from defendant and his girlfriend. The officer knew that defendant and his girlfriend had a history of domestic violence and that the girlfriend had been under psychiatric care. When he asked the girlfriend where the defendant was, she responded that she did not know. The officer became concerned that defendant might be dead or seriously injured so he sent two police officers to defendant's residence to check on him. When the officers knocked on his door at approximately 6 a.m. and received no response, they went into the house to check on defendant.

In *People v. McGee* (1986), 140 Ill. App. 3d 677, we held that an officer had a reasonable belief that an emergency situation existed where the officer, responding to a report that a foul odor emanated

from a house where there were several barking dogs running loose on the roof, smelled a strong odor emanating from the house and observed through a window several bird cages with no birds in them and a dusty office area with a chair overturned. When no one answered after he rang the bell, he entered the house.

In both *Koniecki* and *McGee*, like the instant case, the police were faced with a situation where they had a reasonable belief that someone inside the premises could be in danger and in need of immediate assistance. The officers did not have a certain belief that this was the case, but the circumstances were such that it was a reasonable belief which dictated immediate action. We believe in the instant case that the cumulative information known at the time of the entry was sufficient to create a reasonable belief that a woman was overdosed in defendants' apartment, and, thus, it was necessary to take immediate action. Therefore, any evidence seized after being seen in plain view during the course of a search for the woman is not inadmissible as a violation of the fourth amendment. We reverse the decision of the circuit court of Lake County and remand the cause for further proceedings.

Reversed and remanded.

McLAREN and NASH, JJ., concur.