2019 IL App (1st) 162943-U

FIFTH DIVISION
December 13, 2019

No. 1-16-2943

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of |
| | ) | Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 15 CR 18984 |
| | ) | |
| THOMAS GATCH, | ) | Honorable |
| | ) | Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE DELORT delivered the judgment of the court.
Presiding Justice Hoffman and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held:* We find the circuit court's admonishments to prospective jurors did not adequately comply with Illinois Supreme Court Rule 431(b). Applying the plain error rule, the evidence in this case was closely balanced, warranting reversal and remand for a new trial based on the court's error. Also, the circuit court erred in its partial denial of defendant's motion to suppress, requiring reversal and remand for a new trial. Further, the evidence presented at trial was sufficient to find defendant guilty of aggravated arson.

¶ 2    A jury convicted defendant Thomas Gatch of aggravated arson, a Class X felony offense

(720 ILCS 5/20-1.1(a), (b) (West 2014)). The circuit court sentenced defendant to six and one half

years in prison, followed by three years of mandatory supervised release. 730 ILCS 5/5-4.5-25(a)

(West 2014). On direct appeal, defendant argues the evidence presented at trial failed to establish

his guilt beyond a reasonable doubt. He also contends that the circuit court erred when it denied his partial motion to suppress evidence obtained in violation of his rights under the fourth amendment (U.S. Const., amend. IV). Alternatively, defendant argues that this case should be reversed and remanded for a new trial because the circuit court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). We reverse and remand for a new trial.

¶ 3                                    BACKGROUND

¶ 4      During the early morning hours of October 29, 2015, the Chicago Fire Department received a call to extinguish a fire burning in the stairwell of a multiunit apartment building. After firefighters extinguished the fire, a fire marshal inspected the stairwell and concluded that the fire had been set intentionally. A Chicago Police Department arson investigation unit arrived to continue the investigation. Detectives interviewed two witnesses and viewed surveillance video footage of the incident, which depicted a figure of a person who appeared to start a fire in the stairwell at about 1:50 a.m. Thereafter, the detectives proceeded to defendant's apartment unit, entered without a warrant, placed him under arrest, and recovered clothing the defendant was seen wearing on a video recorded after the fire had been extinguished. Five minutes after the first entry, the police again entered defendant's apartment unit without a warrant, entered his bedroom, and collected additional clothing as evidence.

¶ 5      A grand jury charged defendant with one count each of aggravated arson (720 ILCS 5/20-1.1(a)(1) (West 2014)), residential arson (720 ILCS 5/20-1(b) (West 2014)), arson (720 ILCS 5/20-1(a)(1) (West 2014)), and criminal damage to property (720 ILCS 5/21-1(a)(1) (West 2014)). Defendant moved to suppress any physical evidence the police collected from his apartment unit, in addition to statements, utterances, reports of gestures, and responses he made to detectives after they unlawfully entered his apartment without a warrant.

¶ 6    On April 13, 2016, the circuit court heard evidence and argument on defendant's motion to supress. Chicago Police Detective Gregory Granadon testified that he arrived at the apartment building with his partner, detective Maria Viti, at about 3:40 a.m. to conduct an arson investigation. He interviewed Cody Morgan, who resided in the building and served as one of the building's maintenance workers, and Manuel Ceniceros, another maintenance worker who resided off the premises. Morgan and Ceniceros showed Detective Granadon the surveillance video footage of the incident.

¶ 7    The fire occurred in the east stairwell of the building between the second and third floors. When Detective Granadon viewed the video footage showing the figure who set the fire, he could not see the person's face due to the position of the camera in the stairwell. He observed that the person who ignited the fire wore a dark colored jacket and pants. That video footage was time-stamped at 1:50 a.m. Video footage of the hallway on the third floor, time-stamped at 1:48 a.m., showed the same subject, wearing dark clothing and a hat, exit what "appeared to be apartment 3B by the view." The camera in that hallway was mounted above the middle of the entrance doors to apartments 3A and 3B. The person that entered the camera frame on that video footage then entered the east stairwell where the fire was subsequently set. Detective Granadon testified that after the fire was ignited, the video footage depicted a person wearing the same clothing description exit the stairwell door and enter apartment 3B.

¶ 8    As Detective Granadon viewed the video footage, he spoke to Morgan and Ceniceros, who each identified the person on the video setting the fire as defendant. Morgan told Detective Granadon that he knew defendant for more than one year and that the day before the incident, Morgan had spoken to defendant. Morgan told Detective Granadon that defendant had been

drinking and was "distraught due to the one year anniversary of a lady friend" that had committed suicide.

¶ 9    Detective Granadon also viewed video footage of the third floor hallway, time-stamped at 2:10 a.m., which showed a male subject exiting apartment 3B wearing different clothing – a light-colored jacket and baseball cap – and proceeding into the east stairwell. Morgan told Detective Granadon that he had spoken to defendant after the fire had been extinguished and that defendant at that time was wearing a light-colored jacket and baseball cap. Morgan told Detective Granadon that defendant was in his apartment.

¶ 10    Detective Granadon stated that "[a]fter looking at the video and talking to Cody Morgan and Manuel Ceniceros and based upon what Cody Morgan told us about the demeanor of the defendant, we thought it best to go up to his apartment." Detective Granadon proceeded up the damaged stairwell to apartment 3B. He stated that he was concerned that defendant may have hurt himself based upon defendant's "feeling for the loss of his lady friend a year prior and watching the video." Detective Granadon stated, "[w]e were fearing the worst," explaining that he was afraid defendant may have been in the process of setting another fire inside of his apartment.

¶ 11    When Detective Granadon arrived in the hallway outside defendant's apartment unit, he knocked on the door. Hearing no response, Detective Granadon became more concerned and entered the apartment unit using a passkey. He walked through an entry foyer and immediately saw defendant sleeping on a couch. Detective Granadon stated that a light-colored jacket and baseball cap were on a table or chair next to the couch. The jacket and cap matched what he saw defendant wearing on the video footage. Detective Granadon placed defendant under arrest and collected the jacket and cap. Detective Granadon did not check the remainder of the apartment for

additional evidence or potential fires because "[m]y main thought was to get [defendant] out of the apartment and get him over to our office."

¶ 12    Five minutes later, he returned to defendant's apartment. Detective Granadon stated that he re-entered defendant's apartment "to secure the apartment to make sure nothing else was in the bedroom or kitchen that we might have missed," including "if the stove was on, candles lit or anything else." He stated that he forgot to check the other rooms the first time he entered the apartment, explaining that "it didn't really dawn on us the first time." He did not smell or see anything on fire in the apartment. In defendant's bedroom, Detective Granadon found a "big, black jacket and the pullover hat" with the word "Chicago" printed on it and collected those items as evidence. Detective Granadon stated that the subject from the video wore a hat that "appear[ed] to have some writing on the front" and a similar black-colored jacket.

¶ 13    Detective Granadon acknowledged that on the video footage, he could not see the face of the person that ignited the fire. He also acknowledged that he could not see the face of the person entering the hallway from the stairwell after the fire was set. Defense counsel asked Detective Granadon, "[s]o nowhere in this video could you say for sure you see Thomas Gatch wearing dark clothing, correct?" Detective Granadon responded, "[c]orrect." Detective Granadon also acknowledged that he could not see if it was defendant that entered apartment 3B after the fire was set.

¶ 14    During argument, the State contended that the detectives learned that defendant had started the fire after speaking to two maintenance workers familiar with him. The detectives also learned that defendant was despondent over the loss of his friend and had been drinking. The State argued that the detectives were working within their scope as "community caretakers" to enter defendant's apartment the first time, without a warrant, to investigate whether defendant was harming himself

or trying to harm others in the building by igniting another fire. The circuit court asked the State, "when [the detectives] see him sleeping on the couch, does that look like he was in the commission of any fire or arson?" The State responded that arresting defendant amounted to a safety issue, stating "[t]his is somebody who just set a fire outside." The State characterized Detective Granadon's actions as "a very limited recovery," and the second entry as "continuing his role as caretaker in the community when he went back and recovered items in plain view."

¶ 15   Defendant argued that Detective Granadon should never have entered the apartment without a warrant because exigent circumstances no longer existed after two hours had elapsed since the time the fire had been set in the stairwell. Defendant contended that the detectives lacked sufficient probable cause to conclude that he set the fire, stating "[a]ll they have is some accusations by some people that they have had no prior contact with." Defendant argued that he was never identified as the person on the surveillance video footage setting the fire, or the person who entered and exited the stairwell before and after the incident occurred. In addition, defendant contended that once the detectives entered the apartment and found him asleep on the couch, they should have turned around and left because there was no evidence of another attempt to set a fire.

¶ 16   The circuit court found that the detectives had probable cause to enter defendant's apartment unit. The court stated that the detectives properly relied on the statements provided by the maintenance workers in the building, who identified defendant as the subject in the video, noting that "there is a certain amount of indicia of reliability." The court stated that the "testimony of the videos *** doesn't have to be an exact science," and that circumstantial evidence supported a probable cause finding that a crime had been committed. Obtaining a warrant for the first entry was unnecessary because the detectives "certainly did have a right under both circumstances of a wellbeing check and also the idea that they had exigent circumstances to enter the apartment." As

to the second entry, the court stated that "[o]nce they walked out of that apartment, they should have got[ten] a warrant to go back in." The court partially denied the motion to suppress as to the initial entry into the apartment and recovery of evidence, but granted the motion as to the second entry and ruled that the recovery of the dark-colored clothing and pullover hat was inadmissible at trial.

¶ 17    A jury trial commenced on September 6, 2016. After the venire was seated, the court introduced the parties and, among other things, stated to the prospective jurors:

> "First off, anybody placed on trial in a criminal case is presumed to be innocent of the charge against him. Basically, what that means, if you were selected as jurors and I sent you back to the jury room without hearing any evidence whatsoever and I told you, I want a verdict on this, the only verdict that you could come back with is not guilty because there was not evidence against Mr. Gatch and he is presumed to be innocent.
>
> Does anybody have any problems understanding that constitutional principle? Please raise your hand in the outer or inner part of the courtroom.
>
> Let the record reflect that nobody has raised their hand.
>
> Does anybody have any problems or qualms about applying the constitutional principle that anybody placed on trial in a criminal case is presumed to be innocent of the charge against him? Please raise your hand."

¶ 18    The circuit court next explained to the venire the burden of proof in criminal cases. The court then stated:

"Does anybody have any problems or qualms about applying that constitutional principle, that the burden of proof is proof beyond a reasonable doubt? In the outer part or the inner part of the courtroom, please raise your hand."

¶ 19    The circuit court continued to discuss burden of proof, explaining that the State is required to prove guilt beyond a reasonable doubt. The court asked whether "anybody [has] any problems understanding that constitutional principle" and whether "anybody [has] any qualms or problems about applying that constitutional principle?"

¶ 20    Next, the circuit court explained a defendant's constitutional right to testify on his own behalf. The court asked, "[d]oes anybody have any problems understanding that constitutional principle in this courtroom?" A prospective juror raised her hand and stated, "I may not understand." The court provided no further explanation and asked if any other prospective jurors had any problems understanding that constitutional principle. The court then inquired, "[d]oes anybody have any qualms or problems about applying that constitutional principle?"

¶ 21    Finally, the circuit court explained to prospective jurors that a defendant has a constitutional right to not testify and that no inference can be drawn from that silence. The court then asked, "[d]oes anybody have any problems understanding that constitutional principle in this courtroom?" The court also asked whether anyone had "any qualms or problems applying that constitutional principle?" There was no response and a jury was seated.

¶ 22    At trial, William Barker testified that he owned the multiunit apartment building in question. The building consisted of 40 one-bedroom and studio units. He described the building as "a long corridor-style building," with three floors and hallways that ran in an east-west direction. The third floor has 12 units, five on each side of the main hallway and apartments 3A and 3B at the east end of the corridor.

¶ 23    Barker worked weekdays in an office located within the building and was familiar with many tenants who resided there, including defendant. Barker stated that defendant resided on the third floor in apartment 3B. Defendant lived alone in his apartment unit. He saw defendant three or four times per day entering and exiting the building. The State asked Barker to identify defendant, but Barker stated that he could not see him. He stated that defendant wore a goatee the last time he saw him.

¶ 24    Barker recounted that on October 29, 2015, he received a telephone call notifying him about the fire at 1:30 or 2:00 in the morning. He was not present in the building during the incident. He arrived at 7:30 or 8:00 that morning to observe the damage to the stairwell. He described two stairwells in the building – one on the north side at the front of the building, and a second located at the rear of the building on the west end. One of the stairwells is located next to the building's lobby. The building maintained security cameras on the premises, including in the building's hallways and stairwells. Barker identified photographs of the damage caused by the fire.

¶ 25    Ceniceros testified that he has been performing maintenance duties at the building for the last seven years and lived nearby. He described the video surveillance system in the building and stated that it was working properly on October 29, 2015. On that date, Ceniceros received a telephone call about the fire at 2:00 a.m. When he arrived at the building shortly thereafter, the fire had already been extinguished. He spoke to Morgan and they viewed the surveillance video footage of the incident.

¶ 26    Ceniceros identified defendant in the courtroom. He met defendant for the first time when defendant moved into the building. On the night of the incident, Ceniceros saw and spoke to defendant in the building lobby at 2:30 a.m. Ceniceros also showed video footage of the incident to officials from the fire and police departments during their investigations. He made a digital

duplicate of the video footage recovered from that night and gave it to the police. Ceniceros described the footage while the State published it to the jury as an exhibit.

¶ 27     Ceniceros first described camera 8, which provided a hallway view on the third floor of the building. The camera was mounted and positioned on the wall above and in between the entrance doors to apartments 3A, on the right side of the frame, and 3B, on the left side of the frame. The doors to the apartment units were not visible in the video footage, a fact which the circuit court itself noted.

¶ 28     The State published to the jury the video time-stamped at 1:48:31 a.m., in which an individual opened the door to the stairwell where the fire occurred. The clip showed a figure enter the hallway from the bottom right corner of the screen, proceed a few steps, and turn right through a doorway. The State next published the video clip of the stairwell where the fire began, which was recorded from camera 14. It showed a person, visible only from the chest down, walk onto a stairway landing, place what appeared to be a flaming bag onto the ground, and then walk back up the stairs. The third clip, time-stamped at 1:49:44 a.m., showed a person enter the third floor hallway through a door on the right, which Ceniceros described as the door to the stairwell, and walk towards the bottom of the left side of the screen, "[t]o 3B." Ceniceros testified that he viewed all of the footage collected from camera 14 from 1:50 a.m. to 1:58 a.m. A tenant who resided in apartment 2A had entered the stairwell while the fire was burning and exited immediately thereafter.

¶ 29     Ceniceros testified regarding what the surveillance video recorded after the fire was extinguished. According to Ceniceros, the video from camera 8 in the third floor hallway, time-stamped at 2:09:32 a.m., depicted defendant leaving his apartment. Ceniceros also described footage of defendant speaking to Morgan in the lobby at 2:10 a.m. Another clip showed defendant

standing in the lobby outside the building office where Ceniceros and Morgan reviewed the surveillance footage of the incident. Defendant could see into the office while they reviewed the footage.

¶ 30     Ceniceros also identified and described the contents of digital photographs captured from the video recording system depicting the incident. However, he could not identify the subject in the photographs depicting the person entering the stairwell before the fire was set. The State nevertheless asked Ceniceros a series of questions regarding those photographs.

¶ 31     The State asked Ceniceros, "the person who is wearing all black in People's Exhibit No. 8, could that be – was that the same height approximately as Mr. Gatch, the defendant?" Over defendant's objection, Ceniceros responded, "[y]es." The State then asked if that person had the same body size and shape as defendant. Ceniceros replied, "[y]es." Next, the State asked, "did that person go towards the same apartment that you know the defendant lives at?" Ceniceros again responded in the affirmative. Finally, the State asked, "aside from this person in black as well as the defendant who you've identified, did anybody else come or go from *** the direction of that apartment?" Ceniceros replied, "[n]o," over defendant's objection. Ceniceros also identified defendant in photographs depicting him entering the third floor hallway after the fire had been extinguished.

¶ 32     On cross-examination, Ceniceros acknowledged that between the hours of 9:00 p.m. on October 28, 2015 and 2:00 a.m. on October 29, 2015, he was not present in the building and was not aware of who was on the third floor. He did not know how many people were in apartments 3A or 3B. All the information Ceniceros recounted was derived only from the surveillance video footage. Defense counsel asked Ceniceros about the State's earlier line of questioning regarding

the subject wearing dark-colored clothing, "from the video you saw, you can see that person go into an apartment?" Ceniceros responded, "[y]es."

¶ 33    Craig Martin testified that on October 29, 2015, he resided with Phillip Robinson in apartment 3A, next door to defendant. At 2:00 a.m., he was asleep in bed with Robinson. He recalled that sirens and lights woke him up. Before that, he and Robinson had not left the apartment. After Martin saw fire department personnel outside his window, he opened the front door of his apartment and saw smoke. He woke up Robinson and began to gather personal belongings. Other than opening the front door and smelling smoke, he and Robinson never left their apartment that night.

¶ 34    The State showed the surveillance video footage of the incident to Martin, who then testified that he was not the subject dressed in black walking towards the stairwell at 1:48 a.m. He also stated that he was not the subject dressed in black on the footage time-stamped at 1:49 a.m. The State asked Martin if the subject in the footage was Robinson. Martin replied, "[n]o," and when asked to clarify how he knew the subject was not Robinson, Martin stated that Robinson "is black," and "[h]e was with me in the apartment."

¶ 35    On cross-examination, defense counsel asked Martin, "[i]s it fair to say that the initial person that walks out, walks out on the side that 3A is?" Martin responded that the subject appeared from the center of the screen.

¶ 36    Chicago Fire Department Marshal Maurice Price testified that he investigated the fire on October 29, 2015. When he arrived at the scene, he observed the stairway on the landing between the second and third floors of the building. He found fire debris on the carpet and evidence of a fire that had burned the walls in the corner of the stairwell. Marshal Price testified that the photographs the State presented to the jury accurately portrayed the fire scene. He determined that

the fire was incendiary, meaning that someone had intentionally started the fire. He concluded that "there were no other means for a fire to have started other than someone actually starting it." He then called the Chicago Police Department's arson investigation unit. He interviewed Morgan and Ceniceros and viewed the surveillance video footage of the incident, which confirmed his earlier findings.

¶ 37    Detective Granadon testified similarly as he did at the suppression hearing, with some omissions. The jury did not hear testimony of the detective's conversation with Morgan, in which Morgan told him that he spoke to defendant the day before the incident. The jury did not hear testimony that defendant had appeared despondent over the loss of his friend and had been drinking the day before the incident. Also, due to the circuit court's ruling on defendant's motion to suppress, the jury did not hear testimony regarding the second entry into defendant's apartment and the recovery of the dark-colored clothing and pullover hat.

¶ 38    Detective Granadon stated that 38 of the 39 units in the building were occupied the night of the incident. He spoke to only a small number of residents during his investigation. The only residents he spoke to who resided on the third floor were Martin and Robinson in 3A. He limited his questioning of residents based on his review of the surveillance video from that night.

¶ 39    During deliberations, the jury submitted a question inquiring, "where is the black jacket [and] second hat?" The jury also requested "transcripts with timestamps of prosecution narration of clips." In response to the first question, the circuit court instructed the jury that "you have heard all the evidence in this case, so please continue to deliberate." The court provided the jury with a copy of the portion of the trial transcript that it requested.

¶ 40    After further deliberation, the jury found defendant guilty of aggravated arson. The circuit court denied defendant's motion for a new trial. He was sentenced to six and one half years in prison followed by three years' mandatory supervised release. This appeal follows.

¶ 41                                    ANALYSIS

¶ 42    Defendant argues that the evidence at trial failed to establish his guilt beyond a reasonable doubt. He also contends that the circuit court erred in its partial denial of his motion to suppress. In the alternative, defendant argues that, in this closely balanced case, the circuit court failed to comply with Rule 431(b), necessitating reversal and remand for a new trial.

¶ 43                          Supreme Court Rule 431(b)

¶ 44    We initially address the issue of whether defendant is entitled to a new trial due to the circuit court's failure to comply with Rule 431(b) (eff. July 1, 2012), because we find it is dispositive. Defendant contends that, although he failed to object to the court's admonishments before *voir dire*, this closely balanced case required the court to ask all prospective jurors whether they understand and accept certain fundamental principles of law, including the presumption that a defendant is innocent and need not present any evidence or testify, and that the State has the burden to prove him guilty beyond a reasonable doubt.

¶ 45    Supreme Court Rule 431(b) provides in relevant part that the circuit court shall ask each potential juror whether that juror "understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her * * *." Ill. S. Ct. R. 431(b) (eff. July 1, 2012). "The language of Rule 431(b) is clear and unambiguous." *People v. Thompson*, 238 Ill.

2d 598, 607 (2010). In essence, the rule "mandates a specific question and response process." *Id.*
We apply a *de novo* standard of review when considering compliance with supreme court rules.
*Id.* at 606-07.

¶ 46    The plain error doctrine allows a reviewing court to bypass normal forfeiture principles
and consider an otherwise unpreserved error affecting substantial rights when either: "(1) the
evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless
of the closeness of the evidence." *People v. Herron*, 215 Ill. 2d 167, 187 (2005); see also Ill. S. Ct.
R. 615(a). Defendant only argues that the first prong of the plain error analysis applies, *i.e.*, "where
the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from
the error and not the evidence." *Herron*, 215 Ill. 2d at 178.

¶ 47    Here, the circuit court clearly failed to comply with the letter of Rule 431(b). As to the
recitation of the first principle, the presumption of innocence, the court asked if the prospective
jurors understood the principle, but failed to inquire whether they accepted it. The court then
recited the second principle and then asked whether "anybody [has] any problems understanding
that constitutional principle," and whether "anybody [has] any qualms or problems about applying
that constitutional principle?" Again, the court did not ask the prospective jurors whether they
accepted that principle. Next, the court explained to the prospective jurors a defendant's right to
testify on his own behalf. The court skipped the third principle – that a defendant is not required
to offer any evidence on his or her own behalf. Finally, the court recited the principle that the
defendant's failure to testify cannot be held against him. Again, the court did not ask the
prospective jurors whether they both understood *and* accepted that principle.

¶ 48    Because the court committed clear error on this issue, we must determine whether the first
prong of the plain error rule is met. Under that prong, we may disregard forfeiture principles and

consider an unpreserved error if the evidence is close, regardless of the seriousness of the error, or, where the evidence is so close that the jury's guilty verdict may have resulted from the error and not the evidence. *Herron*, 215 Ill. 2d at 178, 187. "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, common sense assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53. Our qualitative assessment is that the evidence here was indeed closely balanced.

¶ 49 In this case, none of the witnesses that testified at trial saw who started the fire. Ceniceros identified defendant as the perpetrator from surveillance video footage of poor quality. A review of that footage shows the perpetrator's face is unidentifiable or out of view of the camera. Furthermore, the camera angle of the third floor hallway does not allow the viewer to determine from which apartment the perpetrator entered or exited at the time of the incident. The circuit court stated this fact in open court. Ceniceros nevertheless surmised that the perpetrator entered apartment 3B even though he could not tell the jury who was depicted in the video clips of the subject wearing dark-colored clothing. Defendant never confessed to the crime and the State presented no physical evidence directly implicating him. The State also produced testimony of defendant's neighbor to show, by process of elimination, that the arsonist must have been defendant. However, Martin had a strong motive to deny any involvement and was asleep during the entire incident. Therefore, he could not fully account for the whereabouts of his partner or anyone else at the time of the incident.

¶ 50 Under the facts as presented to the jury, we find that the evidence was closely balanced. Further, considering that defendant presented no evidence at trial and the circuit court failed to advise the prospective jurors of the principle that a defendant is not required to offer any evidence, the court's error in admonishing potential jurors under Rule 431(b) is reviewable under the plain

error doctrine. The court's error threatened to tip the scales of justice against defendant. We find reversible error on this issue and, therefore, defendant is entitled to a new trial.

¶ 51                    Partial Denial of Defendant's Motion to Suppress

¶ 52    In light of the Rule 431(b) violation and our finding requiring reversal for a new trial, we also consider whether the circuit court erred when it partially denied defendant's motion to suppress. Defendant argues that the circuit court's partial denial of his motion allowed Detective Granadon to testify about observations he made during the illegal first entry into his apartment. Defendant alternatively contends that, even if the detectives had probable cause to arrest him, they should have obtained a search or arrest warrant prior to entering his apartment. According to defendant, no exigent circumstances justified the warrantless entry. In addition, the failure to obtain a warrant could not be cured by invoking the community caretaking doctrine because the decision to enter his apartment was made while the detectives were investigating a crime. During the warrantless entry, Detective Granadon collected evidence and made observations, including the fact defendant was alone in his apartment, which were later introduced into evidence at trial. Defendant argued that the entry into his apartment violated his constitutional rights under the fourth amendment.

¶ 53    Initially, we note that defendant failed to include the partial denial of his motion to suppress as an issue in his motion for a new trial. Generally, to preserve an error at trial, a defendant must raise both a contemporaneous and written posttrial objection. *People v. Enoch*, 122 Ill. 2d 176, 186-87 (1988); see also *People v. Almond*, 2015 IL 113817, ¶ 54 (reaffirming *Enoch*). The failure to raise a contemporaneous and/or posttrial objection results in a forfeiture of that issue. *Id*. Defendant argues that we should consider the partial denial of his motion to suppress under the constitutional-issue exception recognized in *Enoch* and extended in *People v. Cregan*, 2014 IL

17

113600, ¶¶ 18-19. *Cregan* extended the exception to the forfeiture rule in noncapital cases when constitutional issues that were properly raised at trial are later raised in postconviction petitions. *Cregan*, 2014 IL 113600, ¶¶ 18-19. Further, our supreme court explained that " 'the interests in judicial economy favor addressing the issue on direct appeal rather than requiring defendant to raise it in a separate postconviction petition.' " *Almond*, 2015 IL 113817, ¶ 54 (quoting *Cregan*, 2014 IL 113600, ¶ 18). In accordance with these interests, we will review the merits of defendant's fourth amendment challenge here. *Almond*, 2015 IL 113817, ¶ 54; *Cregan*, 2014 IL 113600, ¶¶ 16, 20.

¶ 54    When reviewing a circuit court's ruling on a motion to suppress evidence, we apply the two-part standard of review adopted by the United States Supreme Court in *Ornelas v. United States*, 517 U.S. 690, 699 (1996). See *People v. Gaytan*, 2015 IL 16223, ¶ 18; *People v. Grant*, 2013 IL 112734, ¶ 12. In doing so, we accord great deference to the circuit court's factual findings and will reverse those findings only if they are against the manifest weight of the evidence. *People v. Hackett*, 2012 IL 111781, ¶ 18. Nevertheless, we review *de novo* the circuit court's ultimate legal ruling as to whether suppression is warranted. *Id.* On review, we are free to make our own assessments of the legal issues, based upon the findings of fact, and to draw our own conclusions. *Id.* Furthermore, on a motion to suppress evidence, the defendant has the burden of producing evidence and proving the search and seizure were unlawful. *People v. Woodrome*, 2013 IL App (4th) 130142, ¶ 16. "[O]nce the defendant makes a *prima facie* showing of an illegal search and seizure, the burden shifts to the State to produce evidence justifying the intrusion." (Internal quotation marks omitted.) *Id.*

¶ 55    "The physical entry of the home is the chief evil against which the wording of the fourth amendment is directed." *People v. Wear*, 229 Ill. 2d 545, 562 (2008). The fourth amendment

guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. Similarly, article I, section 6 of the Illinois Constitution states that the "people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches [and] seizures." Ill. Const. 1970, art. I, § 6; *People v. Pitman*, 211 Ill. 2d 502, 513 (2004); *People v. Martin*, 2017 IL App (1st) 143225, ¶ 18. Accordingly, "it is a basic principle of the fourth amendment" that absent exigent circumstances or consent, "searches and seizures inside a home without a warrant are presumptively unreasonable." *Wear*, 229 Ill. 2d at 562 (citing *Payton v. New York*, 445 U.S. 573, 586 (1980)); see also *Groh v. Ramirez*, 540 U.S. 551, 559 (2004). "This is because, ' "[t]o be arrested in the home involves not only the invasion attendant to all arrests but also an invasion of the sanctity of the home. This is simply too substantial an invasion to allow without a warrant, at least in the absence of exigent circumstances, even when it is accomplished under statutory authority and when probable cause is clearly present." [Citation.]' " *Wear*, 229 Ill. 2d at 562-63 (quoting *Payton*, 445 U.S. at 588–89); see also *People v. Johnson*, 237 Ill. 2d 81, 89 (2010) ("Reasonableness under the fourth amendment generally requires a warrant supported by probable cause."); *People v. Foskey*, 136 Ill. 2d 66, 75 (1990) (requiring probable cause and exigent circumstances before an officer may make a warrantless arrest inside a home).

¶ 56    First, the circuit court determined that Detective Granadon had probable cause to arrest defendant for the aggravated arson without securing a warrant. For constitutional purposes, a person is seized when he is placed under arrest. *People v. Lopez*, 229 Ill. 2d 322, 346 (2008). Under the fourth amendment, an arrest must be accompanied by a warrant supported by probable cause. *People v. Sorenson*, 196 Ill. 2d 425, 432 (2001); see also *People v. Robinson*, 167 Ill. 2d 397, 405 (1995) ("A warrantless arrest is unlawful absent probable cause."); *People v. Montgomery*, 112 Ill.

2d 517, 525 (1986) ("An arrest executed without a warrant is valid only if supported by probable cause.") "Probable cause to arrest exists when the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime." *Wear*, 229 Ill. 2d at 563-64 (citing *People v. Love*, 199 Ill. 2d 269, 279 (2002)). The existence of probable cause depends upon the totality of the circumstances at the time of the arrest. *Wear*, 229 Ill. 2d at 564 (citing *Love*, 199 Ill. 2d at 279). In deciding whether probable cause exists, police officers may use their own training and experience to make inferences that may elude ordinary citizens. *People v. Jones*, 215 Ill. 2d 261, 274 (2005). "A court must examine the events leading up to the search or seizure, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable law enforcement officer, amount to probable cause." *Id*. Further, a determination of probable cause is governed by common sense practical considerations and not by technical legal rules. *People v. Sims*, 192 Ill. 2d 592, 615 (2000). The evidence upon which probable cause is based need not be sufficient to convict, but must be more than a hunch or mere suspicion. *People v. Reynolds*, 94 Ill. 2d 160, 166 (1983).

¶ 57     In this case, Detective Granadon testified during the suppression hearing that he viewed the surveillance video footage of the perpetrator, which showed a subject intentionally setting a fire in the stairwell. He interviewed Morgan and Ceniceros, who identified the perpetrator as defendant, even though Detective Granadon himself was unable to see the subject's face in the video clips due to their poor quality. He testified that after the subject set the fire, he exited the stairwell and entered apartment 3B. However, the positioning of the camera in the third floor hallway precludes the viewer from definitively being able to discern which apartment the subject entered. Morgan told Detective Granadon that he had spoken to defendant the day before the incident. Defendant had told Morgan that he was despondent over the loss of a friend and that he

20

had been drinking. None of this evidence was sufficient to sustain a finding of probable cause that this particular defendant committed a crime. We find the events leading up to the entry into defendant's apartment, viewed from the standpoint of an objectively reasonable law enforcement officer, did not amount to probable cause. *People v. Bunch*, 327 Ill. App. 3d 979, 983-84 (2002) (finding police officer lacked probable cause to arrest the defendant without a warrant, stating "[s]uspicions, no matter how reasonable, do not add up to probable cause to arrest").

¶ 58    Even assuming the evidence sufficiently established probable cause, Detective Granadon required both probable cause *and* exigent circumstances to make a warrantless arrest inside defendant's home. *Foskey*, 136 Ill. 2d at 75. Illinois courts have recognized "an 'emergency' exception to the search warrant requirement whereby police may make a warrantless entry into private premises if they reasonably believe an emergency exists which dictates the need for immediate action for the purpose of providing aid to persons or property in need thereof." *People v. Koniecki,* 135 Ill.App.3d 394, 398-99 (1985). "The purpose, to offer assistance to a citizen possibly imperiled, not to obtain evidence of a crime, justifies a search." *Id*. at 399. "Under the 'emergency' exception to the warrant requirement, the reasonableness of the belief that an emergency, a situation requiring immediate action, exists is determined by the entirety of all the circumstances known to the police at the time of the entry." *Id*. "The burden of demonstrating exigent need for a warrantless search or arrest is on the State." *Foskey,* 136 Ill.2d at 75.

¶ 59    A burning building creates an exigency that justifies a warrantless entry by fire officials for the purpose of extinguishing the fire. *Michigan v. Clifford*, 464 U.S. 287, 293 (1984). Certainly, Detective Granadon's entry into the building itself was warranted by the fire. However, once the fire was extinguished and its location and cause determined, the scope of the entry and search was limited to the area where the fire occurred. *Clifford*, 464 U.S. at 297-98.

¶ 60 In *Clifford*, a fire started at the defendants' home while they were out of town. Firefighters extinguished the blaze within an hour and a half, after which all fire and police personnel left the scene. Five hours later, a team of arson investigators arrived at the residence for the first time to investigate the cause of the blaze. They found a work crew on the scene boarding up the residence and pumping water out of the basement. The investigators learned that the defendants had been notified of the fire and had instructed their insurance agent to send the work crew to secure the house. Nevertheless, the investigators entered the house and conducted an extensive search without obtaining either consent or an administrative warrant. Investigators found in the basement two fuel cans and a crock pot attached to an electrical timer. They determined that the fire had been set intentionally and that it had been caused by the crock pot. The investigators seized the evidence from the basement and extended their search to the upper portions of the house, where they found additional evidence of arson. The defendants were charged with arson and moved to suppress all evidence seized in the warrantless search on fourth and fourteenth amendment grounds.

¶ 61 The United States Supreme Court in *Clifford* held that, because the warrantless search of the basement and upper areas of the defendants' home was authorized neither by consent nor exigent circumstances, the evidence seized in that search was obtained in violation of their rights under the fourth and fourteenth amendments. *Clifford*, 464 U.S. at 297-98. The Court stated that "[t]he scope of such a search is limited to that reasonably necessary to determine the cause and origin of a fire and to ensure against rekindling. As soon as the investigators determined that the fire had originated in the basement and had been caused by the crock pot and timer found beneath the basement stairs, the scope of their search was limited to the basement area." *Id*. The Court continued:

"Although the investigators "could have used whatever evidence they discovered in the basement to establish probable cause to search the remainder of the house, they could not lawfully undertake that search without a prior judicial determination that a successful showing of probable cause had been made. Because there were no exigent circumstances justifying the upstairs search, and it was undertaken without a prior showing of probable cause before an independent judicial officer, we hold that this search of a home was unreasonable under the Fourth and Fourteenth Amendments, regardless of the validity of the basement search." *Id*. at 298.

¶ 62 In this case, Detective Granadon's forced entry into defendant's apartment was unreasonable based on the totality of the circumstances. Firefighters extinguished the fire in the stairwell before 2:00 a.m., only minutes after it had been ignited. After the fire had been extinguished and the cause determined, there had been no reports of additional fires being set anywhere else in the building or a rekindling of the original fire. Thus, any exigency created by the fire itself had dissipated before Detective Granadon's arrival at the scene at about 3:40 a.m. Although Detective Granadon testified that he was worried defendant could be setting another fire in his apartment, he did not smell smoke or detect any signs of a fire while he stood outside of defendant's apartment.

¶ 63 Even assuming, *arguendo*, the warrantless entry into defendant's apartment was permissible because of an emergency, once Detective Granadon saw defendant sleeping on the couch and, furthermore, observed no evidence of additional fires or incendiary materials in defendant's apartment, any concerns of an emergency should have ended at that point. No further investigation was warranted. Here, any exigent circumstances that would have allowed Detective Granadon entry into defendant's apartment without a warrant had dissipated by the time he entered.

23

Accordingly, any evidence or materials recovered following the illegal entry likewise should have been precluded at trial under the "fruit-of-the-poisonous-tree" doctrine. *People v. Bernard*, 2015 IL App (2d) 120451, ¶ 12 ("Under that doctrine, a fourth-amendment violation is deemed the poisonous tree, and any evidence obtained by exploiting that violation will be suppressed as fruit of that tree.").

¶ 64    The State, however, also raised the community caretaker exception to the warrant requirement during argument on defendant's motion to suppress.[1] See *People v. McDonough*, 239 Ill. 2d 260, 272 (2010). Our supreme court discussed the challenge of applying the community caretaker doctrine:

> " 'Most people who appear to be in distress would welcome a genuine offer of police assistance. But permitting police to search or seize whenever they might be pursuing community-caretaking goals risks undermining constitutional protections. The challenge of [the] community-caretaking doctrine is to permit helpful police to fulfill their function of assisting the public, while ensuring that searches for law-enforcement purposes satisfy the requirements of the Fourth Amendment.' "
>
> *McDonough*, 239 Ill. 2d at 272 (quoting M. Dimino, *Police Paternalism: Community Caretaking, Assistance Searches, and Fourth Amendment Reasonableness,* 66 Wash. & Lee L.Rev. 1485, 1562–63 (2009)).

¶ 65    Two general criteria must exist before finding the community-caretaker exception applies. First, the government actor must be performing some function other than the investigation of a crime. Second, the search must have been undertaken to protect the safety of the general public.

---

[1]    Although the State did not address this exception in its response brief, we nevertheless address it here because the circuit court partially denied defendant's motion to suppress for the first entry into the apartment based on the detectives' right to conduct a well-being check.

*People v. Luedemann,* 222 Ill.2d 530, 545–46, 857 N.E.2d 187, 197 (2006). For example, in *McDonough*, a police officer observed a vehicle on the side of the highway and approached it to render assistance. *McDonough*, 239 Ill. 2d at 273. Upon making contact with the driver, he smelled alcohol on the driver's breath, which gave him reasonable suspicion to detain and investigate the driver for driving under the influence of alcohol. *Id*. at 274. The driver's subsequent arrest for DUI was not invalidated by the warrantless seizure because the officer was not investigating a crime when he made contact with the driver, and his decision to render aid was objectively reasonable under the circumstances. *Id*. at 273-74.

¶ 66    In this case, Detective Granadon was dispatched on October 29, 2015 to the building to investigate a possible arson. He arrived at the scene, interviewed witnesses, reviewed surveillance video footage, and observed the damaged stairwell. The record supports a determination that Detective Granadon was in the middle of investigating the arson and that he sought entry to defendant's apartment to continue that investigation after Morgan and Ceniceros identified him as the perpetrator. Although Detective Granadon testified that Morgan had told him defendant appeared despondent the day before the incident, Morgan also saw defendant in the lobby after the fire had been extinguished. Neither Morgan nor Ceniceros told Detective Granadon that defendant continued to appear distraught that night after they both had spoken to him in the lobby. We conclude that Detective Granadon was performing the investigation of a crime at the time he entered defendant's apartment and, therefore, the community caretaker exception did not apply. *McDonough*, 239 Ill. 2d at 272-73.

¶ 67    In its response brief, the State raises two exceptions to fourth amendment violations for the first time. First, the State contends that Detective Granadon was permitted to lawfully seize the clothing found next to defendant under the plain view exception. Next, the State argues for

application of the good-faith exception of the exclusionary rule, citing *Herring v. United States*, 555 U.S. 135, 140 (2009). The State urges us to determine under the good faith exception "whether a reasonably well trained officer would have known that the search was illegal in light of all the circumstances." (internal quotation marks omitted.) *Id*. at 145.

¶ 68    During the suppression hearing, the State argued that Detective Granadon had probable cause to enter defendant's apartment, and that exigent circumstances and the community caretaker exception applied during the first entry. The State made no specific mention of the plain view doctrine or good faith exception during the suppression hearing or during argument on defendant's posttrial motion. When the circuit court partially denied defendant's motion to suppress, it found the detectives had probable cause and concluded that they "certainly did have a right under both circumstances of a wellbeing check and also the idea that they had exigent circumstances to enter the apartment."

¶ 69    In *People v. Washington*, 238 Ill. App. 3d 371, 373 (1992), the court found that although the State did not use the words "plain view" during argument at trial or upon its oral motion for review, the exception was presented to the court. There, the assistant State's Attorney argued that the police officer properly conducted a field interview with the defendant and while questioning him, the officer saw a portion of a plastic bag protruding from his waistband. *Id*. The State then noted that the officer testified that he had previously seen narcotics packaged in plastic bags on numerous occasions. The court in *Washington* found this argument set forth the requirements to apply the plain view exception even though the State did not use that terminology below. *Id*.

¶ 70    Likewise, the State in this case did not use the term "plain view" when it presented its argument during the suppression hearing. Nevertheless, the State contended that, upon entry into defendant's apartment, Detective Granadon observed the clothing defendant wore in the video

clips recorded after the incident as part of the State's argument that it was admissible as evidence at trial. Accordingly, we find the State did not waive its argument under the plain view exception. *Id*.

¶ 71 This exception allows a police officer to seize an object without a search warrant if: (1) the officer is lawfully located in the place where he observed the object; (2) the incriminating character of the object is immediately apparent; and (3) the officers have a lawful right of access to the object. *Jones*, 215 Ill. 2d at 271-72 (plain view doctrine allows police to seize an object without a warrant). Here, we have found that Detective Granadon lacked probable cause to enter defendant's apartment. Thus, the plain view exception is inapplicable because the detective was not lawfully located in defendant's apartment and did not have a lawful right of access to the clothing he found next to defendant. Moreover, the incriminating character of the clothing defendant wore *after* the incident is not immediately apparent because the State never connected this clothing to the commission of the crime.

¶ 72 As to the good faith exception, "[a]n issue may be considered waived on appeal where a party neither objects at trial nor raises the issue in a written posttrial motion." *People v. Damian*, 299 Ill. App. 3d 489, 494 (1998) (citing *Enoch*, 122 Ill. 2d at 185). In this case, the State's failure to argue the good faith exception before the circuit court "deprived the [trial] judge of the opportunity to address such an argument or conduct any necessary hearing." *Damian*, 299 Ill. App. 3d at 494. We find the State waived this argument on appeal. *Id*. (finding the State waived on appeal its argument that the evidence obtained was admissible under the good faith exception to the exclusionary rule).

¶ 73 In sum, the circuit court erred in partially denying defendant's motion to suppress where (1) Detective Granadon lacked probable cause to enter defendant's apartment, (2) exigent

circumstances did not justify the warrantless entry into his apartment, (3) the community-caretaker doctrine did not apply to force entry into his apartment, and (4) the plain view exception did not apply. Further, the State waived its argument on appeal that the good faith exception to the exclusionary rule applies. On retrial, any evidence gleaned from the entry into defendant's apartment shall be suppressed. *Bernard*, 2015 IL App (2d) 120451, ¶ 12.

¶ 74                                   Sufficiency of the Evidence

¶ 75     We now consider defendant's argument that there was insufficient evidence to establish that he set the fire in the stairwell of the apartment building. He contends that the State produced no evidence of direct guilt, such as a confession, eyewitness confirmation, or physical evidence connecting him to the crime. Defendant argues the State presented circumstantial evidence that was inconclusive and highly speculative. According to defendant, the surveillance video footage presented was of such poor quality that even Ceniceros admitted he could not identify the person depicted. In addition, the footage did not show which apartment the arsonist entered and exited; instead it showed that the perpetrator could have come from one of two separate units, both of which were occupied that night.

¶ 76     When a defendant challenges the sufficiency of the evidence supporting a conviction, we must determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Brown*, 2013 IL 114196, ¶ 48. "This standard of review applies in all criminal cases whether the evidence is direct or circumstantial." *People v. Ehlert*, 211 Ill. 2d 192, 202 (2004).

¶ 77     In this case, there is no direct evidence linking defendant to the crime of aggravated arson. However, "[c]ircumstantial evidence is sufficient to sustain a criminal conviction, provided that

such evidence satisfies proof beyond a reasonable doubt of the elements of the crime charged." *People v. Hall*, 194 Ill. 2d 305, 330 (2000); see also *People v. Dukes*, 146 Ill. App. 3d 790, 794 (1986) ("the crime of arson is, by its very nature, secretive and incapable of direct proof"). Such evidence must produce a reasonable and moral certainty that the defendant committed the crime. *People v. Morton*, 95 Ill. App. 3d 280, 282 (1981). A defendant's guilt may not rest on speculation. *People v. Escort*, 2017 IL App (1st) 151247, ¶ 21.

¶ 78    As explained above, the evidence in this case was extraordinarily close and, for the most part, uncorroborated. Nonetheless, a reasonable jury could find based on circumstantial evidence that defendant was the individual who set the fire based on the video clips showing the perpetrator exiting the vicinity of apartments 3A and 3B during the time in question, as well as the identification of defendant as the perpetrator by Ceniceros. Further, a reasonable jury could conclude defendant was guilty even without Detective Granadon's testimony regarding the first entry into defendant's apartment, which we find inadmissible at retrial. Therefore, we reject this contention of error.

¶ 79                                    CONCLUSION

¶ 80    We find the circuit court's admonishments did not adequately address the principles under Illinois Supreme Court Rule 431(b). Under the plain error rule, the evidence in this case was closely balanced, warranting reversal and remand for a new trial due to the court's error in admonishing the prospective jurors under Rule 431(b). We also find that the circuit court erred in its partial denial of defendant's motion to suppress, requiring reversal and remand for a new trial. On remand, any evidence collected as a result of the illegal search and seizure shall be suppressed at retrial. Finally, we conclude that the evidence presented at trial was sufficient to find defendant guilty of aggravated arson.

¶ 81    Reversed and remanded.